UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                                         Case Number: 04-11165-7

    XIONG VANG,

                Debtor.

----------------------------------------------------------------

    XIONG VANG,

                Plaintiff,

v.                                                                                              Adversary Number: 04-94

    UW STOUT STUDENT BUSINESS SERVICES
    and EDUCATIONAL CREDIT MANAGEMENT
    CORPORATION,

                Defendants.

---

MEMORANDUM OPINION, FINDINGS OF FACT,
AND
<u>CONCLUSIONS OF LAW</u>

The Court conducted the trial in this adversary proceeding on January 28, 2005. The debtor, Xiong Vang, brought this action to determine whether his student loan obligations to the defendants are dischargeable under the terms of 11 U.S.C. § 523(a)(8). The debtor is represented by Lucy A. Bjork; defendant UW Stout Student Business Services is represented by Tomas L. Stafford; and defendant Educational Credit Management Corporation is represented by Jeffrey W. Guettinger.

The goal of the nation's student loan programs is to facilitate participation in higher education. In theory, students are equipped to participate in professions which not only allow them to repay their loans, but also increase their standard of living and benefit society as a whole. Often, students emerge successfully from school and are able to repay their student loans without significant hardship. But there are others less fortunate. Many debtors go to school and ultimately fail to get a degree despite incurring large amounts of debt. Some obtain a degree and for other reasons find themselves unable to work in their chosen profession. Still others manage to find work but face other challenges or find it impossible to make the loan payments. But few students find themselves in the debtor's circumstances - allowed entry into college despite serious questions about his academic ability and mastery of English, constantly critiqued for poor language skills and struggling in various courses, but ultimately awarded a degree in an extraordinary exercise of administrative discretion.

Xiong Vang filed this chapter 7 bankruptcy case on February 23, 2004. At the time of the filing, he had defaulted on his student loans. He owed approximately $36,803.59 to Educational Credit Management Corporation and another $22,187.04 to the University of Wisconsin-Stout. On April 23, 2004, Vang filed this adversary proceeding, alleging that repayment of the student loans would constitute an "undue hardship" upon him and his dependents within the meaning of 11 U.S.C. § 523(a)(8).

The history of 11 U.S.C. § 523(a)(8) is perhaps best described as long and tortured, as the dischargeability of student loans was a source of tension for both Congress and the judiciary even before the enactment of the bankruptcy code in 1978. See generally, Jeffrey L. Zackerman, Discharging Student Loans in Bankruptcy: The Need for a Uniform "Undue

Hardship" Test, 65 U. Cin. L. Rev. 691 (Winter 1997);  Robert F. Salvin, Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?, 71 Tul. L. Rev. 139 (Nov. 1996).  Because the Bankruptcy Act of 1898 did not except student loans from discharge, students frequently sought to discharge such debts as general unsecured claims in bankruptcy.  Stories suggested that professionals such as doctors and lawyers were seeking to discharge the very loans that made it possible for them to pursue potentially lucrative careers.  Ultimately, as one court noted,

> A few serious abuses of the bankruptcy laws by debtors with large amounts of educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and before any loans became due, have generated the movement for an exception to discharge.

Matter of Rappaport, 16 B.R. 615, 616 (Bankr. D. N.J. 1981).

In the early 1970s Congress created a Commission on the Bankruptcy Laws of the United States, whose purpose was to review the 1898 Act and suggest modifications to the law.  Those recommendations culminated in a report submitted to Congress in 1973.  In that report, one of the Commission's recommendations was that student loans should be presumptively nondischargeable unless the debtor could show that he or she was unable to earn sufficient income to fund repayment attempts.  The Commission's "model statute" submitted with the report would have prohibited discharge of student loans which came due within five years of the bankruptcy filing absent a showing of "undue hardship."  The Commission did not define "undue hardship," but stated:

> In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned

3

> income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

See Executive Director, Commission on the Bankruptcy Laws of the United States, Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, pt. II (1973), reprinted in Collier on Bankruptcy app. 2 (Lawrence P. King ed., 15th ed. 1996), at 140-41.

Three years after the Commission submitted its report, Congress enacted a substantively similar statute as part of the Education Amendments of 1976. See Pub. L. No. 94-482, § 439A, 90 Stat. 2081, 2141. When Congress enacted the present bankruptcy code into law in 1978, this exception to discharge was retained. The legislative history thus reflects a continuing congressional policy that it should be more difficult to obtain a discharge of educational obligations than is the case for typical unsecured debts.[1] The problem the courts have struggled with in the ensuing years is determining what exactly constitutes an "undue hardship" within the meaning of the statute.

The initial interpretive challenge is that virtually every debtor in bankruptcy is strapped financially. As a result, courts have determined that economic distress alone does not constitute an undue hardship; there must be something more that makes the debtor's

---

[1] Subsequent legislative enactments likewise reflect this perspective. For example, the restrictions on discharge of student loans originally applied only in chapter 7 liquidation cases, but in 1990 Congress amended the code to make § 523(a)(8) applicable to chapter 13 cases as well. At the same time, Congress extended the nondischargeability period from five years to seven. In 1998, Congress removed the time limit, and at the present time the only way a student loan can be discharged is if the debtor makes a sufficient showing that repayment would constitute an "undue hardship."

circumstance uniquely difficult. While a variety of tests evolved to address the issue, at this point a majority of the circuits - including the Seventh Circuit - have adopted the "additional circumstances" test first promulgated by the Second Circuit in the case of Brunner v. New York State Higher Educ. Services Corp., 831 F.2d 395 (2$^d$ Cir. 1987). See Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298 (3$^d$ Cir. 1995); Matter of Roberson, 999 F.2d 1132 (7th Cir. 1993). This test provides that a student loan may not be discharged unless the debtor demonstrates:

    1.    That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans.

    2.    That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

    3.    That the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396; Roberson, 999 F.2d at 1135; see also Faish, 72 F.3d at 305-06 (adopting the Brunner test as being most reflective of congressional intent).

More recently, in the case of Goulet v. Educ. Credit Mgmt. Corp., 284 F.3d 773 (7th Cir. 2002), the Seventh Circuit had the opportunity to revisit the issue of the dischargeability of student loans.[2] In Goulet, the debtor was a 55-year-old recovering drug and alcohol addict who lived with his mother. He had not completed his master's degree in psychology and felt that his prior felony conviction precluded a job in counseling. His efforts at working as a real estate broker had been unsuccessful and his most recent employment was as a bartender,

---

[2] The Goulet case was the result of an appeal of this Court's order discharging the debtor's student loan obligations.

a job that paid relatively little and threatened his sobriety. Even though the court recognized that Goulet could not maintain a minimal standard of living if forced to repay the loans, it concluded that Goulet failed to demonstrate sufficient "additional, exceptional circumstances" necessary to satisfy the second part of the Brunner test. Id. at 778. Essentially, the court found that Goulet did not demonstrate the "certainty of hopelessness" required under the "undue hardship" provision. Id. As the court stated:

> He has serious problems, but we are reluctant to label these pre-loan problems "additional, exceptional circumstances" so as to constitute "undue hardship" for purposes of Section 523(a)(8). . . . Presumably he has some source of revenue to maintain his claimed drug dependency. As the bankruptcy court noted, Goulet is an intelligent man. The record does not reveal that he lacks usable job skills or that he is hindered by a limited education. . . . The record does not demonstrate that he lacks the capacity to work, only that he does not seem anxious to do so. . . . Under these circumstances, we conclude that Goulet's condition has not reached the "certainty of hopelessness" that would lead us to find that his condition is likely to persist for a significant portion of the repayment period.

Id., 284 F.3d at 779.

It is with this admonishment regarding the "certainty of hopelessness" that the Court turns its attention toward the present case. Here, Vang contends that a variety of factors precluded him from repaying his outstanding student loan obligations. He claims to have a verbal and nonverbal IQ within the mentally retarded range, along with an inability to speak, read, or write the English language.[3] He also contends that he has difficulty with daily

---

[3] The debtor is a member of the sizeable Hmong population which was relocated from Southeast Asia in the wake of the United States' withdrawal from Vietnam in the 1970s. Different Hmong communities emigrated to the United States over the ensuing years after suffering reprisals for their willingness to help U.S. military forces in the region. Despite significant language and cultural barriers, many Hmong have made great strides to integrate themselves into American society - in Eau Claire, Wisconsin, for example, the Hmong population has seen its first college graduate, the first Hmong
(continued...)

"living skills" such as navigating or traveling because he cannot read a map, and that he cannot manage his monthly income and expenses because of his retardation. Vang is also the single parent of two preschool age sons who themselves have significant developmental delays, qualify for social security disability benefits, and receive special educational treatment. He has been unemployed for more than a year, and his annual income since 2001 has not exceeded $6,729.00 in any calendar year.

As expressed to counsel during the pretrial conference, the Court's concern in this case was exactly how a debtor with an IQ in the mentally retarded range and an inability to speak, read, or write English was able to not only attend college but graduate with a degree in art education. It is indeed difficult to contemplate exactly how such a feat can be accomplished, and his apparent success in obtaining a degree poses a significant hurdle when attempting to argue that his mental condition and language skills prevent him from obtaining more than a "minimal standard of living" for the foreseeable future. At trial, the Court heard the testimony of a number of witnesses who shed considerable light on the debtor's circumstances. In addition to the debtor, the Court heard the testimony of several people who either examined the debtor or who had encountered the debtor in various educational or administrative capacities.

The debtor introduced the testimony of Dr. Paul M. Callier, a clinical neuropsychologist who examined Mr. Vang. According to Dr. Callier, Mr. Vang has a verbal

---

[3](...continued)
member of the local police force, and elected a Hmong member of the city council. The debtor arrived from Thailand in 1989, and his story is unfortunately not as successful. Indeed, it appears that in this case, the government and an educational institution may have gone too far in their good faith attempts to help a member of the Hmong community.

IQ of 55, a performance IQ of 62, and a full scale IQ of 55, all of which place him within the "mild mentally retarded" range of intelligence and at the 0.1 percentile rank when compared to the general population. On a test of nonverbal intelligence (which is designed to eliminate disparities in testing based upon language skills), his IQ was determined to be 58, which apparently indicates that Mr. Vang is of reduced intelligence even when the testing process adjusts for any language handicap he might have.

In addition, results from the Wide Range Achievement Test indicate that the debtor's reading level is at the 0.2 percentile, as are his spelling and math skills. All of these results place him in the "preschool range" in terms of academic ability. Dr. Callier was also surprised to hear that the debtor had managed to achieve his college degree; the debtor informed Dr. Callier that he had "help" doing his school work, but in his report Dr. Callier nonetheless noted that "without investigating the college situation further, it is difficult to ascertain how this was done." Nonetheless, Dr. Callier was firmly convinced that the debtor is cognitively limited in ways that significantly impair his ability to find employment. While Dr. Callier did concede that the debtor might be able to find "gainful employment" of some fashion, he was concerned that any such employment would be significantly restricted by the debtor's difficulties with reading, writing, and speaking the English language.

The debtor also introduced the testimony of Vicky Ebensperger, a speech and language pathologist with the Dunn County Department of Human Services. She testified regarding the debtor's two children, Ming Vang and Jean Vang. Both children have been involved with the Dunn County Infant Development Program and both suffer from significant developmental delays and language problems. The older child is no longer in the Dunn

County program, having "graduated" into an early education program in the public schools. Ms. Ebensperger testified that the school district was required to hire an extra classroom aide to assist with the child, who is rather uncontrollable. There was also testimony regarding biting episodes and other violent outbursts. The debtor has sole custody of the children as his wife resides in California.

The Court also heard testimony from Saymao Vang, a representative of the Hmong Assistance Association, who has helped the debtor on numerous occasions.[4] Saymao Vang testified that the debtor needs help reading a map, cannot travel by himself easily, and often requires assistance with daily chores such as money management and the like. And Jeb Kaiser of the University of Wisconsin-Stout Vocational Rehabilitation Institute testified about an interview with the debtor which largely confirms Dr. Callier's conclusions regarding the debtor's mental capacities. His test of adult basic education placed the debtor at the 1 percentile in reading (at approximately the first grade level). His suggested job possibilities for the debtor included such positions as janitor, housekeeper, laundry worker, kitchen helper, and dietary aide. Noticeably absent from this list, one might note, is any position which would utilize his degree in art education, or any job for someone with a college degree.

The creditors offered the testimony of Paul DeLong, the director for UW-Stout's art education program, to rebut some of the debtor's contentions as well as defend the school's reputation. Professor DeLong never had the debtor in a class, but he did meet with him on

---

[4] The debtor and Saymao Vang are not related.

several occasions regarding his academic progress. The professor admitted that during these sessions the debtor's wife did most of the talking, and that when the debtor spoke his command of language was minimal and halting. Nonetheless, the professor contended that there was never any indication that the debtor could not perform academically, and pointed to various courses on the debtor's transcript where he received grades of C or better (for example, the debtor received a B in Drawing I, a B in Intermediate Algebra, an A- in Painting I, and so on).

In 2000, after the debtor had completed over 150 credits but was unable to comply with the requirements for certification in art education (a necessity in order to actually teach art), Professor DeLong sought and obtained what he indicated was an unprecedented waiver from the university. He appealed to the administration of the university to award the debtor a degree in art education "without certification," pointing out that among the debtor's many deficiencies were the failure to pass a standardized test, failing each time with "very low scores"; his low GPA; his "difficulties with oral communications, i.e., command of language"; and his lack of student teaching (an impossibility given his language difficulties).

At the same time, Professor DeLong noted that the debtor had amassed more than enough credits to graduate otherwise, and that it would be "in everyone's best interest" that he receive a B.S. degree in art education. While characterizing this move as "washing one's hands" of the debtor is undoubtedly too harsh, it cannot seriously be doubted that by this time the administrators and professors in the art education program recognized that the debtor's academic problems and language difficulties were simply not going to improve. There were repeated references in the record to professors' concerns about the debtor's

inability to communicate, all of which suggest that at least some of his professors recognized a problem which was largely being glossed over by the use of tutors and other forms of assistance.

The point of this Court's inquiry is not whether the debtor received an actual benefit from his course of study. In other words, the debtor chose to go to school and sought educational loans in order to fund his course of study. Cases have repeatedly held that where the debtor chose to pursue a course of study, the relative value of that study to the debtor in the job market is not a consideration in determining whether or not repayment of the loans constitutes an "undue hardship." As the Seventh Circuit stated in Roberson, 999 F.2d at 1137, "[t]he government is not twisting the arms of potential students." The decision to borrow for a college education lies with the individual. Id. Further, the question is whether the debtor is employable in other areas, not whether a career in a particular field is forestalled. Goulet, 284 F.3d at 779. The real issue before the Court is whether the debtor's asserted handicap - his mental capacity and his inability to communicate adequately in English - constitutes sufficient "additional circumstances" under the Seventh Circuit's standard for undue hardship.

It is really only in that light that the Court examines the debtor's educational history, because the key inquiry is whether the debtor's condition manifested itself during his school career, what steps were taken to overcome those handicaps, and whether any conclusions can be drawn from that history which speak to the debtor's prospects going forward. In this regard, the debtor indicated that he was significantly assisted by his wife, he frequently received additional time to complete assignments and tests, and often used a translator for

assistance. It is also clear from the record that the debtor's instructors were frequently concerned about his abilities, especially his language difficulties. And it is important to note that while he does have some assistance through the efforts of Saymao Vang and the Hmong Assistance Association, he no longer has his wife's assistance in handling some of the more complicated family affairs.[5]

The Court is thus confronted with a 31-year-old debtor who emigrated to the United States from Thailand in 1989. He graduated from high school and took English as a Second Language in both high school and at the University of Wisconsin-Stout. Tests administered by both Dr. Callier and a member of the University's own Vocational Rehabilitation Institute indicate that he reads on about the preschool or first grade level, his English language skills are fragmented at best, and he has difficulty with mathematics. When pressed to understand how it is possible that he managed to graduate from college, he simply indicates that he had people "help" him. His history of past employment is marginal at best, and he is presently unemployed. He indicates that his employment problems stem from his trouble understanding the English language and according to the vocational expert, he is best suited for menial jobs such as a janitorial position, kitchen helper, or the like.

It might be possible for the Court to suggest that all the debtor needs is a bit more language instruction and he would be able to find employment which would permit him to repay these loans at some point in the future. That would overlook, if not absolutely ignore,

---

[5] There was some suggestion during the trial that the debtor's wife encouraged the debtor to continue going to school in order to continue receiving student loans and financial assistance; in essence, the debtor seemed to be indicating that his wife may have been "milking" his ability to receive financial aid. There is no concrete evidence that this was the case, although it might help explain why the debtor kept going to school after it became clear he would be unable to obtain his desired goal.

the fact that the debtor has attempted to overcome the language barrier for more than fifteen years with very little success. The correspondence in the record indicates that he is a hard-working individual who has repeatedly attempted to improve his language skills. The reality is that despite years of educational assistance, tutoring, and the like, he still reads and writes on at best a first grade level. This is undoubtedly connected to the fact that Dr. Callier's tests place him in the "mild mentally retarded" category even when accounting for the language and cultural issues.

A review of the debtor's employment history reveals that his annual income has routinely hovered at or around the poverty level. Admittedly, Jeb Kaiser suggests that he might be able to find some sort of menial employment and there was some dispute at trial about what sort of wages the debtor might expect from such a position, but both Mr. Kaiser and Dr. Callier agree that the debtor's language difficulties pose a significant employment hurdle. Indeed, the debtor indicated that the reason he lost his previous jobs was because he couldn't communicate or understand English well enough to perform as required. His expenses exceed his income and there was little contention that those expenses have not been minimized. Based upon all of this, the Court is obligated to conclude that the debtor cannot maintain a minimal standard of living for himself and his dependents if he is required to repay the loans.

The challenge in this case is whether the debtor has demonstrated a "certainty of hopelessness" and provided evidence of sufficient "additional circumstances" which warrant discharge of the debt. Admittedly, the debtor's problems apparently predate his decision to go to school. The debtor clearly hoped that he would be able to gain a mastery of English

sufficient to become a teacher. He received significant assistance while he was in school, but it appears from the record that he was unable to overcome his "cognitive limitations" as found by Dr. Callier and his language difficulties as verified by Mr. Kaiser. Even Professor DeLong concedes that the debtor had problems with the language, and the extraordinary efforts to award the debtor a college degree seem largely designed to eliminate the problem of a student who was simply unable to meet the certification requirements.

Are these conditions likely to persist for a significant portion of the repayment period? The testimony of Dr. Callier indicates that the debtor is in fact mildly mentally retarded. According to the test of nonverbal intelligence, the debtor is of "reduced intelligence" even when one accounts for his language handicap. Despite years of education and study in English as a second language, the debtor can barely read or write English (and also cannot read or write his native tongue either). His oral communication skills limit his ability to find a job. There is no magic potion which will correct these problems. The debtor's mental retardation will last the remainder of his life. Given that his considerable efforts to learn English as a second language have largely come to naught, there is little for the Court to conclude but that this condition will persist indefinitely as well.

Therefore, the Court finds that it is obligated to find that there are "additional circumstances" which will exist for a significant portion of the repayment period. This requires that the Court consider the "third prong" of the Roberson test, which provides that the debtor must demonstrate "good faith" efforts at repayment. This part of the test contemplates that the Court examine the debtor's payment history to see whether the debtor has acted in good faith toward his creditors. There is no requirement that the debtor have

14

paid a certain percentage or minimum amount of the loans at issue in order to demonstrate "good faith." If the debtor has not had the financial ability to pay the debt, he will not be penalized as a result. Coats v. New Jersey Higher Educ. Assistance Auth. (In re Coats), 214 B.R. 397, 405 (Bankr. N.D. Okla. 1997). Indeed, the debtor's failure to make payments does not prevent a finding of good faith where the debtor never had the resources to make such payments. Sands v. United Student Aid Funds, Inc. (Matter of Sands), 166 B.R. 299 (Bankr. W.D. Mich. 1994).

Under the facts of this case - where the debtor has not made more than $6,729.00 in any year since his graduation in 2000 - the Court finds that the debtor has acted in good faith. Given that the debtor lives at or around the poverty level and cares for his two sons, it would be difficult to see how he could have diverted any of his meager funds to make payments on his student loans. As the Third Circuit stated in Faish, the bankruptcy code does not require that the debtor "live in abject poverty . . . before a student loan may be discharged." 72 F.3d at 305. Here, the debtor lives virtually at that level, has two sons who depend on him, and has been unable to find work given his mental and language difficulties.[6] Despite his efforts, he has been unable to generate resources from which to make the required payments.

Accordingly, the debtor's student loan obligations to the defendants are discharged as constituting an "undue hardship" upon the debtor and his dependents within the meaning of 11 U.S.C. § 523(a)(8).

---

[6] Further, given that a portion of the debtor's meager income is the result of his children's social security disability benefits, they qualify for special educational programs, and he receives a variety of other forms of assistance, forced repayment of the loans would seemingly channel funds from one governmental agency into the hands of another, hardly a logical result.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Dated: April 15, 2005

BY THE COURT:

/s/ Thomas S. Utschig

Hon. Thomas S. Utschig
U.S. Bankruptcy Judge